Robert E. Sheridan
Kathleen L. DeSoto
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT 59807-7909
Telephone (406) 523-2500
Telefax (406) 523-2595
resheridan@garlington.com
kldesoto@garlington.com

Attorneys for Defendants Flathead Indian Irrigation Project and
  Cooperative Management Entity

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| HARRY BEAUCHAMP, JR., Individually and as Personal Representative of the ESTATES OF HARRY BEAUCHAMP, III and DENNIS BEAUCHAMP, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>FLATHEAD INDIAN IRRIGATION PROJECT, COOPERATIVE MANAGEMENT ENTITY, BUREAU OF INDIAN AFFAIRS, UNITED STATES OF AMERICA, and JOHN DOES 1 THROUGH 15,<br><br>Defendants. | CV-13-91-M-DLC<br><br><br>DEFENDANTS FLATHEAD INDIAN IRRIGATION PROJECT AND COOPERATIVE MANAGEMENT ENTITY'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ........................................................................... 1

II.    FACTUAL BACKGROUND ..................................................... 3

III.   DISCUSSION...........................................................................11

     A.    Summary Judgment Standard............................................11

     B.    Because Montana law specifically holds that an irrigation entity has no duty to install devices to prevent persons from accessing ditches or bridges over canals, CME cannot be found legally responsible for the deaths of Harry and Dennis Beauchamp..............12

     C.    Because the CME and FIIP did not engage in wilful or wanton misconduct, or act in a grossly negligent manner, they are not liable to Beauchamp for the drowning deaths of Harry and Dennis Beauchamp. ...................................................................15

     D.    Beauchamp cannot sustain his nuisance claims. ...............................20

IV.   CONCLUSION ........................................................................23

CERTIFICATE OF COMPLIANCE..................................................................25

# TABLE OF AUTHORITIES

Page (s)

**Cases**

*Barnes v. City of Thompson Falls,*
  1999 MT 77, 294 Mont. 76, 979 P.2d 1275.....................................................21
*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)............................................................................ 11-12
*Freeman v. Arpaio,*
  125 F.3d 732 (9th Cir. 1997), *overruled on other grounds,*
  *Penwell v. Holtgeerts,* 386 Fed. App'x 665 (9th Cir. 2010)..............................12
*Gatlin-Johnson v. City of Miles City,*
  2012 MT 302, 367 Mont. 414, 291 P.3d 1129.............................................14, 17
*Jobe v. City of Polson,*
  2004 MT 183, 322 Mont. 157, 94 P.2d 743................................................ 16-17
*Limberhand v. Big Ditch Co.,*
  218 Mont. 132, 706 P.2d 491 (1985)........................................................ 13-15
*Nat'l Ass'n of Optometrists & Opticians v. Harris,*
  682 F.3d 1144 (9th Cir. 2012)...................................................................12
*Saari v. Winter Sports, Inc.,*
  2003 MT 31, 314 Mont. 212, 64 P.3d 1038..................................................17
*State ex rel. Dep't of Environmental Quality v. BNSF Ry. Co.,*
  2010 MT 267, 358 Mont. 368, 246 P.3d 1037................................................21
*Weinert v. City of Great Falls,*
  2004 MT 168, 322 Mont. 38, 97 P.3d 1079...................................................17

**Statutes**

Mont. Code Ann. § 1-1-204(5) ...................................................................16
Mont. Code Ann. § 27-30-101 ...................................................................20
Mont. Code Ann. § 27-30-102(1) (2013) .......................................................21
Mont. Code Ann. § 85-7-2211 (2013)................................................... 13-14, 22
Mont. Code Ann. § 85-7-2212 (2013).................................................. 15, 20, 22

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................11
Fed. R. Civ. P. 56(c)(1)(A) .......................................................................11

Defendants Flathead Indian Irrigation Project ("FIIP") and Cooperative

Management Entity ("CME") respectfully submit the following brief in support of

their Motion for Summary Judgment.

## I.   INTRODUCTION

This case arises from the tragic accidental deaths of Harry Beauchamp III

("Harry") and Dennis Beauchamp ("Dennis") in August 2010.  Both boys drowned

in the Dry Creek Canal of the FIIP after Dennis fell into the canal from a

hydrology access structure or walkway, and Harry jumped in after him to help him.

Their father, Harry Beauchamp Jr. ("Beauchamp) brought this case against the

CME, FIIP, the Bureau of Indian Affairs and the United States of America,

alleging numerous claims stemming from the boys' death by drowning.  At the

time of the accident, the CME had been in existence for approximately five

months, and had authority for operation and management of the FIIP for

approximately four months.

The FIIP is a large irrigation project located on the Flathead Indian

Reservation, serving water users, tribal and non-tribal, throughout the Reservation.

It has been in existence since the turn of the twentieth century, and most of its

infrastructure was completed by the mid-twentieth century.

The Montana Legislature has enacted statutes protecting irrigation districts

and private irrigation entities by limiting the duties they have and by limiting

liability to when the Plaintiff can show that the entity acted willfully and wantonly, causing death or injury, regardless of the cause of action brought by a Plaintiff. Beauchamp has argued that CME and FIIP acted willfully and wantonly by failing to fence off the Dry Creek canal, failing to put up warning signs, and failing to install escape mechanisms within the canal itself. However, Montana law relieves irrigators from fencing and taking other steps to prevent access to an irrigation ditch or structure, and Beauchamp cannot establish that CME and FIIP considered putting in escape mechanisms and chose not to, or even that escape mechanisms in irrigation canals and ditches are widely accepted and the standard in the industry.

Beauchamp has no evidence to support his claim that FIIP and CME were aware of a high probability of injury at the Dry Creek Canal and the hydrology access structure in particular, and cannot dispute the testimony from CME employees that they never saw members of the public accessing the area where the structure was located and where the boys fell into the ditch. Beauchamp also has no evidence to controvert the testimony of CME employees that, prior to the boys' accident, no one had ever drowned in the Dry Creek liner and no one had ever fallen from the access structure crossing the Dry Creek liner.

Even though it is also precluded by the immunity statute, Beauchamp's nuisance claim fails as a matter of law because the irrigation activities, and the limitation of duties and immunity from liability are authorized by law, which

Montana holds cannot be a nuisance as a matter of law. Although Montana does recognize a qualified nuisance, Beauchamp's claim is subsumed by the immunity statute and because he cannot show willful and wanton conduct, it, too fails as a matter of law.

## II.   FACTUAL BACKGROUND

In August 2010, the Beauchamp family, along with Torie Martell, drove from the Wolf Point, Montana area to Western Montana to camp with other family members at the Twin Lakes area on the Flathead Reservation. Statement of Undisputed Facts ("SUF") ¶¶ 71-74, Aug. 13, 2014. The FIIP, which is in the area where the Beauchamps camped, is a large irrigation system consisting of lands, reservoirs, canals, ditches, laterals, equipment, vehicles, among other items. SUF ¶ 3. The FIIP was established and authorized by Acts of Congress in 1904 and 1908. SUF ¶¶ 1-2.

Until April 2010, the FIIP was owned, operated, managed and maintained by the Bureau of Indian Affairs ("BIA"). SUF ¶ 4. In 2010, as required by federal statute, the BIA transferred operational and management duties of the FIIP to an organization representing the owners of the lands irrigated by the FIIP. SUF ¶¶ 2, 8. This entity, known as the CME, was made up of four representatives of the three local irrigation Districts (Jocko Valley, Mission, and Flathead) and four representatives from Confederated Salish and Kootenai tribal interests (Jocko,

Mission Valley and Camas Divisions of the FIIP under the BIA and one "at large" tribal representative). SUF ¶ 6. The agreement creating this entity, known as the "Cooperative Agreement," was approved by then-Attorney General Steve Bullock and was effective March 15, 2010. SUF ¶ 4.

On April 7, 2010, representatives of the BIA and the newly formed CME signed a document referred to as the "Transfer Agreement." SUF ¶ 8. This agreement transferred the authority to manage and operate the FIIP to the CME. SUF ¶ 9. The BIA retained liability for any acts or omissions during the construction, operation, management, and maintenance of the FIIP from its Congressional authorization to the date of transfer, and the CME agreed to indemnify and hold the BIA harmless for any damages for lawsuits arising after the date of the transfer. SUF ¶¶ 10-11.

One of the canals in the FIIP is known as the Dry Creek Canal, or Dry Creek liner. SUF ¶ 14. The Dry Creek Canal is a concrete lined, approximately five mile long irrigation canal bringing water from the Tabor Reservoir (also referred to as St. Mary's Lake) to the Dry Creek pool. SUF ¶ 14. Construction of the Dry Creek Canal began in 1920 and was apparently completed in 1929, although it appears that additional work was done on the canal in the 1940s. SUF ¶ 14. The Tabor Reservoir is the sole supply of irrigation water for the southeastern part of the Mission Division of the FIIP; as such, water from the reservoir is released, through

the Dry Creek Canal, as late in the season as possible to keep water flowing to the irrigators.  SUF ¶ 15.

Water measurements have been taken for many years along the Dry Creek Canal, among other areas in the FIIP.  In 1993, the Confederated Salish and Kootenai Tribes ("the Tribes") worked with the United States Geological Survey to identify optimal locations for water measurement in FIIP structures.  SUF ¶¶ 19; 21-22.  The Tribes sought to characterize water resources on the reservation, as well as support their ongoing efforts to secure and protect their water rights.  SUF ¶ 23.  The USGS recommended placing a water measuring device on the Dry Creek Canal, downstream from an existing slope or staff gauge.  SUF ¶ 19.

After considering the options, the Tribes chose to request installation of a hydrology access bridge or structure on the Dry Creek Canal.  SUF ¶¶ 24-25.  The Tribes requested a metal footbridge with a single handrail on the downstream side. SUF ¶ 26.  Seth Makepeace, the tribal hydrologist, noted that the Tribes always requested a single handrail on water measuring structures as the tribal hydrographers, who actually took the water measurements, used 9 foot wading or measuring rods, and that for safety and efficiency reasons, a single handrail model was the best model for their specific, unique purposes.  SUF ¶¶ 27-29.  While he acknowledged that it would not be impossible to measure with a 9 foot rod if there were handrails on both sides of the structure, Mr. Makepeace noted that it was

"necessitated for normal practice and efficient use of our time" and that no sites where the tribal hydrographers used a 9 foot rod had double handrails. SUF ¶ 30.

In response to the Tribes' request, the FIIP (still under the management of the BIA) built the structure at issue in this case in approximately 1995. SUF ¶ 33. Calvin Hawkins, a BIA employee, was instructed by Chane Salois, then Project Manager of the FIIP, to construct the walkway on the Dry Creek Canal with a downstream handrail and no handrail on the upstream side. SUF ¶ 34. He was further instructed to use the Bureau of Reclamation Safety and Health Standards for walkway width, pipe size, and handrail specifications. SUF ¶ 34.

The structure on the Dry Creek Canal consists of an 8-inch diameter pipe as a load carrying member, with a 24-inch wide expanded steel deck, with steel framing angled handrails to the banks. SUF ¶ 35. The location of the structure is on that portion of the Dry Creek Canal that abuts a spur road, or maintenance road, which loops off the main road leading from the town of St. Ignatius up to the Tabor Reservoir and Twin Lakes areas. SUF ¶ 36. The road is for use by FIIP or tribal employees to maintain the canal or take water measurements, and Curtis Yazzie, a long-time FIIP employee who accesses the road every day for his job, has never encountered a member of the public on the spur road. SUF ¶¶ 43-44. Chuck Courville, who also was a long-time FIIP employee, confirms that although it is possible someone looking for huckleberries or Christmas trees could access the

road, he only knew of FIIP employees accessing the road. SUF ¶¶ 39-41. There are no recreational opportunities, such as fishing, hiking, biking, or anything else off the spur road. SUF ¶ 42.

The Tabor Reservoir is approximately a quarter to a half mile from the hydrology access structure, on the other side of the main road. SUF ¶ 16. Although there are some camp sites up on the far north end of the Tabor Reservoir area, there are no campsites or picnic areas off the spur road. SUF ¶¶ 18 and 37. Twin Lakes, where the Beauchamp family camped in August of 2010, is approximately two and half miles from the Tabor Reservoir area. SUF ¶ 17.

The Tribes used the hydrology access structure on the Dry Creek Canal from 1996 to 2005, when they stopped using the site due to staffing reductions. SUF ¶ 31. After stopping using the site, the Tribes did not tell the BIA they would never seek to use the site again, nor did they tell the CME, after it assumed operational and management authority over the FIIP in April 2010, that they would never seek to use that site again. SUF ¶ 32.

Neither the Dry Creek Canal itself nor the hydrology access walkway have any signs warning of the dangers associated with irrigation canals, nor do they have any fences preventing persons from accessing the canal or the walkway structure over the canal water. SUF ¶¶ 48-49. There are no escape mechanisms within the Dry Creek Canal. SUF ¶ 50.

At the time the Dry Creek Canal was built, there does not appear to be any guidelines or standards issued by any regulatory body. However, the Bureau of Reclamation later published Safety and Health Standards as well as Design of Small Canal Structures. SUF ¶¶ 34, 55. Frank Muth, a professional engineer hired by Mr. Beauchamp in this case, admits that these "standards" are guidelines or recommendations, and not mandates for any particular structure. SUF ¶ 59. He admitted that the vast majority of irrigation structures in the American West, which he estimated to be in the hundreds of thousands, had no handrails, no warning signs, and were likely not certified by professional engineers. SUF ¶ 60. He concluded that it was a matter of judgment for an engineer to determine whether a handrail was appropriate under the given circumstances. SUF ¶ 62.

Dan Hoffman, a hydrologist hired by Mr. Beauchamp in this case, admitted that the Canal and Water Conveyance Public Safety Best Practices Survey, which he reviewed in connection with his work on this case, concluded that there are no commonly accepted standards of practice, or best practices, when it comes to public safety and water conveyance. SUF ¶ 65. Neither Hoffman nor Muth had reviewed any of the Bureau of Reclamation documents relative to canals prior to their retention as expert witnesses in this case. SUF ¶¶ 55, 64. Mr. Hoffman further admitted that he understood Montana law did not require irrigators to fence irrigation structures. SUF ¶ 66. Finally, Mr. Hoffman acknowledged that the

standards he relied on to reach his conclusions were issued after the Dry Creek Canal was built and that the standards do not specify or require retrofitting already existing structures. SUF ¶ 70.

Although both Mr. Hoffman and Mr. Muth concluded that the BIA and CME had actual knowledge of danger particular to the Dry Creek Canal and the hydrology structure, they admitted that they based that conclusion on the general premise that irrigation canals can be dangerous and the existence of recreation areas up the road from the spur road off of which the structure was located. SUF ¶¶ 58, 69. Neither Hoffman nor Muth had any facts to contradict Curtis Yazzie's statement that he had never seen a member of the public on the spur road in all the years he had been accessing it daily for work. SUF ¶¶ 58, 69. Mr. Yazzie's observation is corroborated by Gordon Wind, who was the Project Manager of the CME at the time of the Beauchamp accident. SUF ¶¶ 46-47.

On August 14, 2010, Harry and Dennis Beauchamp and Torie Martell were gathering cedar down by Tabor Reservoir. SUF ¶ 76. Although Mr. Beauchamp had noticed the canal on the way up to the campsite, he did not have a specific conversation with Harry or Dennis about water safety, because he thought they knew, from growing up around rivers, of the dangers of moving water and of the need to be respectful and careful around moving water. SUF ¶ 75. When they were gathering cedar, Harry parked the van they were traveling in about six yards

off the main road, on the spur road.  SUF ¶ 77.  After they gathered cedar, they got

back in the van and drove to Tabor Reservoir to take pictures, and then returned

again to the parking spot just off the main road.  SUF ¶ 78.  They took pictures by

the creek portion of Dry Creek, and Dennis ran ahead of Torie and Harry down the

road to the access structure.  SUF ¶¶ 79-80.  Dennis walked onto the structure, and

Harry and Torie joined him shortly.  SUF ¶ 81.

Right after they got on the structure, Harry warned Dennis to be careful.

SUF ¶ 82.  Both Torie and Harry were holding on to the handrail on the

downstream side.  SUF ¶ 82.  Harry asked Dennis, who was on the far side of the

structure, to come back to the side of the canal they originally accessed the

structure from, to take pictures of Harry and Torie on the structure.  SUF ¶ 83.

Torie was leaning against the downstream handrail and was looking to her left.

SUF ¶ 84.  Dennis crossed in front of Harry, and was about to cross in front of

Torie, when he fell into the canal.  SUF ¶ 84.  Harry jumped over the downstream

handrail into the canal, and grabbed Dennis.  SUF ¶ 85.  Both boys drowned in the

canal.  SUF ¶ 86.

Prior to Harry and Dennis Beauchamp, no person has ever drowned as a

result of falling or jumping into the Dry Creek Canal liner, and there have been no

reports of anyone falling off the access structure over the Dry Creek Canal.  SUF

¶ 87.  The only confirmed drowning in the FIIP prior to the Beauchamp accident

that the CME is aware of occurred in the summer of 2009 and involved a Montana

Highway Patrolman who jumped into a pump canal in Polson, Montana, in an

effort to help his dog, who was struggling to get out of the canal.  SUF ¶ 89.

## III.  DISCUSSION

A.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact" relating to the claims made, by citing materials in

the record, "including depositions, documents . . . or other materials."  Fed. R. Civ.

P. 56(a) and (c)(1)(A).  "[T]he plain language of Rule 56(c) mandates the entry of

summary judgment . . . against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).[1]  The Court in *Celotex* emphasized that summary judgment is not

to be disfavored but rather employed as an "integral part of the Federal Rules as a

whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'"  *Celotex*, 477 U.S. at 327.  Courts must construe

Rule 56(c) with regard to the rights of both parties, including persons who oppose

claims having no basis in fact.  *Celotex*, 477 U.S. at 327.  A party's failure to make

a sufficient showing on an essential element of a case entitles the moving party to

---

[1] The Federal Rules of Civil Procedure were amended and renumbered;
however, the standard in reviewing a motion for summary judgment remains.

summary judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

Not all disputes create a genuine issue of material fact.  "A dispute as to a material fact is 'genuine' if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds*, *Penwell v. Holtgeerts*, 386 Fed. App'x 665 (9th Cir. 2010).  Mere assertions or allegations by the opposing party, without factual support from the record, are insufficient to defeat summary judgment.  *Celotex*, 477 U.S. at 323-324.  Only disputes over material facts, which affect the outcome of the suit, preclude the entry of summary judgment.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248 (1986)).

B.  Because Montana law specifically holds that an irrigation entity has no duty to install devices to prevent persons from accessing ditches or bridges over canals, CME cannot be found legally responsible for the deaths of Harry and Dennis Beauchamp.

In his Amended Complaint, Beauchamp asserts five causes of action against the Defendants:  negligence, wrongful death, survivorship, attractive nuisance, and public nuisance.  Each of these claims is premised on the theory that CME and FIIP had a duty to Harry and Dennis Beauchamp to prevent their access to the ditch.  However, Montana law specifically holds that irrigators have a duty only to keep their ditches in general repair and condition, but have no duty whatsoever to prevent persons from accessing the ditches:

> **85-7-2211. Irrigation ditches -- duties relating to safety.** An
> irrigation district or private person or entity owning or operating
> irrigation ditches must keep irrigation ditches in good general repair
> and condition, but for the purpose of protecting persons and property
> from injury or damage has no duty to:
>     (1) erect fences;
>     (2) install grates or other protective devices where a ditch goes
> underground or under a bridge or other object; or
>     (3) prevent access to ditches by persons or animals.

Mont. Code Ann. § 85-7-2211 (2013).

Prior to the enactment of this statute in 1987, the Montana Supreme Court

discussed whether the parent of a child who drowned in an irrigation ditch in

Billings could bring claims of attractive nuisance and negligence against the ditch

company. *Limberhand v. Big Ditch Co.*, 218 Mont. 132, 706 P.2d 491 (1985).

The Court considered whether attractive nuisance was an appropriate doctrine to

apply to children who drowned in canals, and held that there was no special duty of

care or precaution to children who entered the canal "unless there is in or about the

artificial stream or body or water some peculiar danger, in the nature of a hidden

peril or trap for the unwary, of which the owner or user has or ought to have

notice." *Limberhand*, 706 P.2d at 496. The Court noted that this concept avoided

the legal fiction of attractive nuisance, which originally developed "to excuse the

unwitting trespass by children," and that the ordinary concepts of negligence—

duty, breach, cause and damages—were more fitting to determine liability in such

cases. *Limberhand*, 706 P.2d at 496.

Based on its discussion of attractive nuisance, the *Limberhand* Court further opined that if the district court determined that there was a fact issue regarding hidden peril, it would follow that, for the claim of negligence, the district court should "instruct the jury that the duty of providing warnings, fences or other protective devices for the unwary would be measured by the landowner's duty to exercise 'ordinary care or skill in the management of his property.'" *Limberhand*, 706 P.2d at 497.

Montana Code Annotated § 85-7-2211 specifically overrules the holding in *Limberhand*, and relieves an entity owning or operating an irrigation ditch system from erecting fences, installing protective devices where a ditch goes underneath a bridge, or otherwise preventing access to the ditch by persons or animals. Under the statute, the CME and FIIP did not have a duty to fence around the Dry Creek Canal or the hydrology access structure, and did not have a duty to prevent access to the ditch by Harry and Dennis Beauchamp, by warning of the existence of rapidly moving water or otherwise stopping them from accessing the Dry Creek Canal.

The existence of a legal duty is an issue of law for the Court to decide. *Gatlin-Johnson v. City of Miles City*, 2012 MT 302, ¶ 11, 367 Mont. 414, 291 P.3d 1129. Here, the Montana Legislature has made clear that irrigators do not have any duty to prevent access to their ditches by persons, and there are no disputed

facts regarding the application of this law to the CME as an entity operating an irrigation ditch system.  As a matter of law, CME and FIIP are entitled to summary judgment on all of Beauchamp's claims to the extent they rely on an alleged failure to prevent access to the Dry Creek Canal by placing a fence around the Dry Creek Canal and the hydrology access structure, and an alleged failure to place signs warning of the danger of the Canal.

C.    Because the CME and FIIP did not engage in willful or wanton misconduct, or act in a grossly negligent manner, they are not liable to Beauchamp for the drowning deaths of Harry and Dennis Beauchamp.

Similarly, after the *Limberhand* case, the Montana Legislature enacted Montana Code Annotated § 85-7-2212 (2013), which provides:

 **85-7-2212. Irrigation ditches -- nonliabilities.** An irrigation district or private person or entity owning or operating irrigation ditches is not liable for:
(1) personal injury or property damage resulting from floodwaters caused by rainfall or other weather conditions or acts of nature;
(2) personal injury or property damage occurring on another's land and caused by water seepage that existed or began before the injured person first arrived on or obtained an interest in the land or before the damaged property was first placed on the land, if the seepage does not carry toxic chemicals onto the land;
(3) injury to a person or property while, without authorization of the district or private person or entity, the person or property is on land or water controlled by the district or private person or entity, unless the irrigation district or private person or entity engaged in willful or wanton misconduct; or
(4) death from a drowning, unless the irrigation district or private person or entity was grossly negligent or engaged in willful or wanton misconduct.

Under this statute, then, CME and FIIP cannot be liable for the drowning

deaths of Harry and Dennis Beauchamp unless they acted in a grossly negligent manner or engaged in willful or wanton misconduct.

Beauchamp alleges that "[t]here are no signs, fences, or gates near the footbridge to restrict access or warn of dangers, despite prior drownings in the canal system," and that CME and FIIP "breached their duty of care by failing to take reasonable measures in safely designing, constructing, and maintaining the Dry Creek Canal and footbridge, and in failing to warn of known dangers." First Am. Compl. ¶¶ 27-28, Jan. 22, 2014 (Doc. 23). Beauchamp's contentions inaccurately rely on the presumption that CME and FIIP had a legal duty to restrict access or warn of dangers to restrict access, and also presume that CME and FIIP had knowledge of prior drownings in the Dry Creek Canal.

Montana Code Annotated § 1-1-204(5) defines "willfully" as:

> when applied to the intent with which an act is done or omitted, means a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate the law, to injure another, or to acquire any advantage.

*See also Jobe v. City of Polson*, 2004 MT 183, ¶ 17, 322 Mont. 157, 94 P.2d 743. While "wanton" is not defined in the Montana statutes, the Montana Supreme Court has defined willful and wanton behavior as:

> an act for which "it is apparent, or reasonably should have been apparent, to the defendant that the result was likely to prove disastrous to the plaintiff, and [the defendant] acted with such indifference toward, or utter disregard of, such a consequence that it can be said he was willing to perpetuate it."

*Jobe*, ¶ 18 (citation omitted). A party may not rely on conclusory or speculative statements to overcome a motion for summary judgment on the issue of willful and wanton conduct, but must instead have actual evidence supporting a reasonable inference that the Defendant acted in a willful and wanton manner. *Saari v. Winter Sports, Inc.*, 2003 MT 31, ¶ 18, 314 Mont. 212, 64 P.3d 1038; *Weinert v. City of Great Falls*, 2004 MT 168, ¶ 33, 322 Mont. 38, 97 P.3d 1079.

The Montana Supreme Court has also found that a plaintiff who has shown differing factual versions of a series of events leading to an injury would be able to bring his claim before a jury. In *Jobe*, the issue was whether a Superintendent of Parks in Polson inspected and saw a rotting dock plank with a hole, which the plaintiff fell through and injured himself. *Jobe*, ¶ 8. The plaintiff argued that the City had knowledge, through the Superintendent of Parks, that the plank had a hole in it more than a week before he was injured, while the City argued that the Superintendent had notice that there was a damaged plank, but not that it had a hole in it. *Jobe*, ¶¶ 11-15.

The Superintendent could not firmly state the date on which he inspected the plank, and there was an issue of fact regarding what he had notice of and when. *Jobe*, ¶ 19. The Montana Supreme Court held that under those facts, and when the credibility of witnesses was at issue, the jury should decide whether the City acted willfully and wantonly. *Jobe*, ¶ 20. *See also Gatlin-Johnson*, ¶¶ 21, 25 (issue of

fact when the City appreciated danger of conduct and the potential of serious injury if it did not construct a fall zone for a playground, including steps it should take to lessen the risk).

By contrast, in this case the undisputed facts establish that the deaths of Harry and Dennis Beauchamp were not foreseeable to the CME or FIIP as there had never been a drowning death on the Dry Creek Canal and no reports whatsoever that anyone had ever fallen into the Canal from the hydrology access structure. Beauchamp and his experts argue that CME and FIIP must have been aware of the risk of injury because CME and FIIP employees were generally aware that irrigation canals are dangerous as they involve swiftly moving water and because there have been other drowning deaths in the FIIP structures.

However, no CME or FIIP employees had any knowledge of any drowning deaths or injuries to persons in the Dry Creek Canal prior to the 2010 Beauchamp accident, and the only confirmed drowning death in the FIIP prior to the Beauchamp accident occurred in 2009, when a man jumped into a canal up by Polson in an effort to save his dog. Prior to the Beauchamp accident, in the approximately 90 years since the Dry Creek Canal was built, there were no deaths or injuries due to a person falling into the Dry Creek Canal liner. Additionally, in the approximately 15 years since the hydrology access structure was placed over the Dry Creek Canal, there were no reports of any person falling from it.

Prior to the Beauchamp accident, no one from CME or FIIP had actual knowledge that anyone other than FIIP or tribal personnel accessed the hydrology access structure by using the spur road. The undisputed testimony from Curtis Yazzie and Gordon Wind is that in their entire time working on the FIIP, they never saw a member of the public on that access road. Curtis Yazzie, who is a ditch rider, was on that road every day that he worked, and never once saw a member of the public on the road.

It is also undisputed that there are no commonly accepted standards of practice or best practices relative to public safety and water conveyances, that the Dry Creek Canal was built prior to any suggested guidelines regarding escape mechanisms in Bureau of Reclamation were issued, that none of the guidelines discussed by either Mr. Muth or Mr. Hoffman require retrofitting the century-old FIIP, and that throughout the American West, most irrigation structures have no handrails, no escape mechanisms, and no signs. Even more telling, in relation to the hydrology access structure itself, Mr. Muth admitted that its only deficiency was the lack of a second handrail on the upstream side, and that it was a matter of judgment for an engineer to put a second handrail on, given the use of the structure.

Quite simply, the undisputed facts of this case establish that it was not foreseeable to CME and FIIP that Harry and Dennis Beauchamp would be in

danger of falling or jumping into the Dry Creek Canal based on the facts as they existed prior to August 2010, and there is no evidence that CME and FIIP acted willfully and wantonly in relation to Harry and Dennis Beauchamp. For those reasons, Montana Code Annotated § 85-7-2212 acts as a complete bar to liability for the claims made by Beauchamp, and CME and FIIP are entitled to summary judgment on all claims.

D.     Beauchamp cannot sustain his nuisance claims.

Beauchamp has also pleaded attractive nuisance and public nuisance claims, arguing that the Dry Creek Canal is both an attractive nuisance and a public nuisance as it was injurious to Beauchamp in particular and the public in general. As set out above, the Montana Supreme Court has rejected the attractive nuisance doctrine in relation to irrigation canals, and has adopted the "hidden peril" negligence standard instead. Accordingly, the attractive nuisance claim cannot go forward as a matter of law.

Nuisance is defined by statute:

**27-30-101. Definition of nuisance.** (1) Anything that is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or that unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, river, bay, stream, canal, or basin or any public park, square, street, or highway is a nuisance.

(2) Nothing that is done or maintained under the express authority of a statute may be deemed a public or private nuisance.

(3) An agricultural or farming operation, a place, an establishment,

> or a facility or any of its appurtenances or the operation of those things is not or does not become a public or private nuisance because of its normal operation as a result of changed residential or commercial conditions in or around its locality if the agricultural or farming operation, place, establishment, or facility has been in operation longer than the complaining resident has been in possession or commercial establishment has been in operation.
>
> (4) Noises resulting from the shooting activities at a shooting range during established hours of operation are not considered a public nuisance.

A public nuisance is defined as "one which affects, at the same time, an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Mont. Code Ann. § 27-30-102(1) (2013). *See also State ex rel. Dep't of Environmental Quality v. BNSF Ry. Co.*, 2010 MT 267, ¶¶ 34-37, 358 Mont. 368, 246 P.3d 1037.

An activity or facility that is expressly authorized by statute cannot be a nuisance as a matter of law unless the plaintiff can show, after a particularized assessment of the statute, "that the defendant was acting wholly outside of its statutory authority." *Barnes v. City of Thompson Falls*, 1999 MT 77, ¶ 25, 294 Mont. 76, 979 P.2d 1275. However, a qualified nuisance may be found, even when the facility or activity is expressly authorized by statute, when the Plaintiff can show negligent design, construction, or maintenance of the facility. *Barnes*, ¶ 25.

The construction of the Dry Creek Canal, along with the entire FIIP, was

authorized by Acts of Congress, and the lack of a duty to prevent access to the irrigation canals and its structures is expressly authorized by Montana Code Annotated § 85-7-2211.  Accordingly, Beauchamp cannot assert a public nuisance as a matter of law.

When read in context with Montana Code Annotated § 85-7-2212, even a qualified nuisance cannot give rise to liability to the CME or FIIP unless there is a higher showing of willful and wanton behavior, as the Montana Legislature has made clear that no liability, regardless of the cause of action, can be found against the irrigator for death or personal injury unless it is as the result of willful and wanton conduct.  In other words, unless Beauchamp can establish that CME and FIIP willfully and wantonly designed, constructed and maintained the Dry Creek Canal and the hydrology structure, his public nuisance claim fails as a matter of law.

As shown above, Beauchamp cannot meet his burden of establishing willful and wanton conduct by CME or FIIP because there is no evidence that CME or FIIP had any knowledge of any risk of danger of drowning associated with the Dry Creek Canal in particular or any knowledge of risk of danger of drowning from the general public entering on the hydrology access structure.  Additionally, it is undisputed that CME (and FIIP while under the authority of the CME) was not involved in the construction or design of either the Dry Creek Canal or the

hydrology access structure, and nothing in the maintenance of the Dry Creek Canal or the hydrology access structure contributed to the deaths of the boys. For these reasons, Beauchamp's nuisance claims should be dismissed.

## IV. CONCLUSION

Because the Montana statutes limit the liability of irrigation entities, and limit the duties such entities have to prevent access to irrigation structures, the Court must determine whether Beauchamp has evidence to show that CME and FIIP acted willfully and wantonly and caused the death of Harry and Dennis Beauchamp by so acting. The evidence offered by Beauchamp in support of his contention that the CME and FIIIP acted in a willful and wanton manner consists of his experts' unsupported conclusions and opinions that CME and FIIP could have, or should have, put fences up around the structures and put signs up to warn of dangers. Neither is required by the law. His experts concede there are no universally accepted standards in canal design and safety features, and that the vast majority of irrigation structures lack handrails, warning signs, and escape mechanisms. Beauchamp has no evidence to rebut the CME employees' testimony about the lack of foreseeability, given the lack of public presence on the spur road and on the hydrology structure and the fact that no one had ever drowned by falling in the Dry Creek Canal in over 90 years. For these reasons, Beauchamp's claims fail as a matter of law, and CME and FIIP respectfully request the Court grant their

Motion for Summary Judgment on all of Beauchamp's claims.

DATED this 13th day of August, 2014.

/s/ Kathleen L. DeSoto
Attorneys for Defendants Flathead Indian
Irrigation Project and Cooperative Management
Entity

CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I certify that this DEFENDANTS FLATHEAD INDIAN IRRIGATION PROJECT AND COOPERATIVE MANAGEMENT ENTITY'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count, calculated by Microsoft Office Word 2010, is 6,043 words long, excluding Caption, Certificate of Service and Certificate of Compliance.

/s/  Kathleen L. DeSoto
Attorneys for Defendants Flathead Indian Irrigation Project and Cooperative Management Entity